# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

EDWARD MARCELINO
MARTINEZ,

       Plaintiff,

v.                                       Case No.  6:19-cv-2394-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

       Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision regarding his application for a period of disability and disability insurance benefits ("DIB").  Following an administrative hearing on March 26, 2018, the assigned Administrative Law Judge ("ALJ") issued a decision on June 27, 2018, finding Plaintiff not disabled from August 31, 2016, the alleged onset date, through the date of the decision.[2]  (Tr. 56-92, 134-53.)  However, the Appeals Council vacated the ALJ's decision and

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Docs. 17 & 21.)

[2] Plaintiff had to establish disability on or before December 31, 2020, his date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 15.)

remanded the matter to the ALJ, in part, for consideration of Plaintiff's 100% service-connected disability rating from the Veteran Administration ("VA") in accordance with 20 C.F.R. § 404.1527(f).  (Tr. 15, 160-61.)

After a supplemental hearing by video on June 7, 2019, the ALJ again found Plaintiff not disabled from August 31, 2016 through July 10, 2019, the date of the second decision.  (Tr. 15-29, 36-55.)   Plaintiff is appealing the Commissioner's second decision and, as he has exhausted his available administrative remedies, the case is properly before the Court.  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED.**

## I.    STANDARD

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that

the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.   Discussion

### A.   Issues on Appeal

Plaintiff raises one general issue on appeal, namely that the ALJ failed to properly weigh the medical opinions of record at each step of the sequential evaluation process.[3]  (Doc. 26 at 28.)  Specifically, Plaintiff argues that the ALJ erred in failing to discuss the opinion of his treating rheumatologist, Sujatha Vuyyuru, M.D., that Plaintiff "met the 1990 ACR Criteria for the Classification of Fibromyalgia as well as the 2010 ACR Diagnostic Criteria," and failed to adequately evaluate Plaintiff's fibromyalgia at step three in accordance with SSR 12-2p, VI. C.[4]  (*Id.* at 28-30.)  Next, Plaintiff contends

---

[3] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

[4] SSR 12-2p provides that, while "[fibromyalgia] cannot meet a listing in appendix 1 because [it] is not a listed impairment," at step three, the SSA must

that the ALJ failed to consider the opinion of Amy Devine, LPN, that Plaintiff had been identified as "High Risk for Falls" by his primary care team and had been prescribed a cane.  (*Id.* at 31.)  Plaintiff also argues that the ALJ's residual functional capacity ("RFC") determination failed to account for Plaintiff's "need to sometimes walk with a cane to prevent falls."  (*Id.*)  Last, Plaintiff argues that the ALJ failed to provide good cause "for not fully following" the opinion of Dr. Yanik Luis-Roig, his treating psychiatrist, that he had an extreme limitation interacting appropriately with the public, a marked limitation responding appropriately to usual work situations and to changes in a routine work setting, and that he could not sustain an eight-hour workday, five days a week.  (*Id.*)  Plaintiff contends that the "opinions of examining physicians," like Dr. Vuyyuru and Dr. Luis-Roig, as well as nurse Devine, "are generally entitled to more weight than the opinion of a non-

---

"determine whether [fibromyalgia] medically equals a listing (for example listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." *Soc. Sec. Ruling, SSR 12-2p, Titles II & XVI: Evaluation of Fibromyalgia*, SSR 12-2P VI. C., 2012 WL 3104869 (S.S.A. July 25, 2010).

     Plaintiff contends that Plaintiff's fibromyalgia meets the listing under 14.09D for inflammatory arthritis as the "record and Plaintiff's testimony supports marked limitations in all three areas" (*i.e.*, activities of daily living, maintaining social functioning, and completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace), pursuant to SSR 12-2p, VI. C.  (Doc. 26 at 29.) Plaintiff also argues that Plaintiff's fibromyalgia medically equals a listing in combination with at least one other medically determinable impairment, as his difficulty with social functioning as a result of his PTSD is at a marked level.  (*Id.*)

examining physician," noting that the "state agency medical consultants did not have a chance to review the entire record." (*Id.* at 33.)

In response, Defendant counters that the ALJ provided "specific reasons, supported by substantial evidence, for the weight she gave the opinion of Plaintiff's treating psychiatrist." (Doc. 27 at 1.)  Next, Defendant argues that the ALJ was not required to "discuss or weigh" Dr. Vuyyuru's questionnaire because she "did not offer any opinions regarding what Plaintiff could still do despite his fibromyalgia, and she did not identify any specific physical or mental restrictions caused by his fibromyalgia." (*Id.*)  Even if the ALJ erred in not assigning any weight to Dr. Vuyyuru's questionnaire, Defendant claims this error was harmless "because the ALJ found that Plaintiff's fibromyalgia was a severe impairment and the doctor's statements do not contradict the ALJ's assessment of Plaintiff's" RFC.  (*Id.* at 1-2.)  Last, Defendant argues that the ALJ was not required to weigh the note from Ms. Devine as it was not from an acceptable medical source "or even an 'other source' whose opinions must be weighed." (*Id.* at 2.)

## B.   Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).
Substantial weight must be given to a treating physician's opinion unless
there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436,
1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not
bolstered by the evidence; (2) evidence supported a contrary finding; or (3)
treating physician's opinion was conclusory or inconsistent with the doctor's
own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th
Cir. 2004).  When a treating physician's opinion does not warrant controlling
weight, the ALJ must nevertheless weigh the medical opinion based on: (1)
the length of the treatment relationship and the frequency of examination,
(2) the nature and extent of the treatment relationship, (3) the medical
evidence supporting the opinion, (4) consistency of the medical opinion with
the record as a whole, (5) specialization in the medical issues at issue, and (6)
any other factors that tend to support or contradict the opinion.  20 C.F.R. §
404.1527(c)(2)-(6).  "However, the ALJ is not required to explicitly address
each of those factors.  Rather, the ALJ must provide 'good cause' for rejecting
a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431
F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more
weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d

513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining [S]tate agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'"  *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[5] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources).  While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision.  SSR 96-6p.

---

[5] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017.  However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

### C.    Relevant Evidence of Record

### 1. Treatment Records from Dr. Luis-Roig[6]

On April 28, 2017, Plaintiff presented to Dr. Luis-Roig for an initial

mental health evaluation.  (Tr. 6837-44.)  Dr. Luis-Roig noted Plaintiff's chief

complaint, in part, as follows:

> Presenting Problem: 31[-]year[-]old discharged from the Air Force
> in March of this year.  Initially seen by triage provider and
> presenting with problems [] adjusting to civilian life.  Feeling
> depressed and angry.  Patient reports history of trauma that
> haunts him until now.  Reports intrusive memories, nightmares,
> hypervigilance, avoidance, irritability, anger, feeling anxious in
> crowded places and being frightened by loud noises.  Patient was
> seen by triage provider because he presented with excessive
> sadness, [] worthlessness, and occasional helplessness.  [He] [h]as
> had suicidal thoughts throughout the year.  Veteran has been
> taking sertraline 200 mg daily, prazosin 2 mg at bedtime, and
> quetiapine 100 mg at bedtime.

(Tr. 6837.)  Plaintiff also reported difficulty sleeping, which improved with

quetiapine, and endorsed lack of interest and motivation, difficulty

concentrating, and lack of energy.  (*Id.*)  Plaintiff also reported, in part, as

follows:

> Feelings of guilt[:] "[M]y wife gives me a guilt trip because I can't
> do much[.]  I feel guilty a lot because I saw a lot of dead bodies
> and I survived[.]  I would help take the dead bodies off the plane
> and take them to morgue[.]  It was emotionally stressful[.]"

---

[6] Plaintiff began mental health treatment at Viera VA clinic in April of 2017
after moving to Florida from Hawaii upon medical discharge from the United States
Air Force.  (Tr. 7106-10.)  At the VA clinic, Plaintiff was treated by various mental
health and medical providers, including Dr. Luis-Roig, Plaintiff's treating
psychiatrist.  (*See, e.g.*, Tr. 6873, 7253.)

8

(*Id.* (internal quotation marks omitted).)

Plaintiff stated that he was in a lot of pain, which was getting worse. (*Id.*) He rated his pain level as 7 out of 10. (Tr. 6839.) Plaintiff denied any past suicide attempts, or suicidal ideations that day, but admitted having suicidal thoughts the previous week. (Tr. 6837-38.) He stated: "I just wanted to leave my house and be gone[.] I told my wife I am not good for my family and [I am] always angry and having outburst[s] and told my wife I wanted to leave[.]" (Tr. 6838.) When asked what was preventing him from committing suicide, Plaintiff responded that he would not hurt himself because of his two-year-old daughter. (*Id.*) Plaintiff denied owning a gun and stated that his military psychiatrist had taken away his guns because he "was going to use them a year ago." (*Id.*)

Plaintiff also admitted to drinking one to two beers a day and to drinking five beers a day before starting Seroquel. (*Id.*) Plaintiff indicated that he had been "struggling with depression for a long time," which had "gotten worse for the past year." (*Id.*) Plaintiff reported having marital conflicts and stated, "I have no motivation to do anything and [my wife] is angry that she works and does everything at home." (*Id.*) Plaintiff reported suffering from psoriatic arthritis and fibromyalgia and stated, "it would be helpful [to] my quality of life if I could do stuff." (*Id.*) In terms of his

psychiatric history, while still in the Air Force, Plaintiff participated in the Behavioral Health Outpatient Intensive Program (BHOIP) for two months for PTSD and presented to the hospital in July 2016 for a psychiatric evaluation but was not admitted.  (*Id*.)

A Mental Status Exam ("MSE") performed by Dr. Luis-Roig revealed that Plaintiff exhibited the following: appropriate dress; normal orientation, grooming, and hygiene; restless motor activity; adequate muscle strength; cooperative interpersonal interaction; normal speech rate and volume; normal and relevant expressive and receptive language; depressed and anxious mood; broad affect; average intelligence; fair fund of knowledge; normal attention and concentration; intact recent and remote memory; logical thought process; no hallucinations; fair judgement and insight; and fair impulse control.  (Tr. 6841.)  Dr. Luis-Roig found that Plaintiff was at a moderate risk for suicide and completed a safety plan.  (Tr. 6842.)  Dr. Luis-Roig noted that Plaintiff presented with PTSD symptoms, rule out alcohol abuse, and with symptoms of hopelessness, helplessness, and worthlessness which were "linked to his physical pain and disability."  (*Id*.)  Plaintiff adamantly denied current suicidal ideation and felt he had made progress "as he cut back on his drinking and the quetiapine [] helped with this."  (*Id*.)  Dr. Luis-Roig's diagnoses included PTSD and Major Depressive Disorder, moderate.  (*Id*.)  Dr. Luis-Roig continued Plaintiff's psychiatric medications

(prazosin and quetiapine), reduced his sertraline dose to 50 mg, started Plaintiff on duloxetine to help with his "mood and nerve pain," and counseled Plaintiff on abstaining from alcohol.  (*Id*.)  Dr. Luis-Roig found that Plaintiff qualified for outpatient care and referred him for individual counseling with Dr. David Philpot.  (Tr. 6842-43.)

At a follow-up appointment on May 15, 2017, Dr. Luis-Roig noted that Plaintiff reported that he had "been very depressed," rating his depression as 9 out of 10 in severity, and denied any recent suicidal ideations but stated he had thoughts about isolating himself.  (Tr. 6811.)  He admitted feelings of worthlessness and hopelessness, but said he would not hurt himself because of his daughter.  (*Id*.)  Plaintiff admitted drinking two to three beers every other day and stated that the quetiapine caused him to feel too tired.  (*Id*.)  Plaintiff indicated he had an MRI scheduled the following week for headaches and memory problems.  (*Id*.)  Plaintiff also reported the following trauma-related symptoms: hypervigilance; intrusive thoughts of trauma; flashbacks; exaggerated startle response; feelings of detachment from others; avoidance of distressing memories, thoughts, and feelings about trauma; and avoidance of external reminders of trauma.  (Tr. 6812.)  Plaintiff rated his pain level as 6 out of 10.  (Tr. 6813.)  Plaintiff's MSE revealed normal findings, except his mood was depressed.  (Tr. 6815.)  Dr. Luis-Roig adjusted Plaintiff's medications, adding trazadone and duloxetine and discontinued

quetiapine.  (Tr. 6816.)

On June 8, 2017, Plaintiff presented to Dr. Luis-Roig on a walk-in basis after calling the VA crisis line the day prior.  (Tr. 7028-35.)  Plaintiff reported dealing with several stressors, including that he had medically retired from the Air Force, and that he, his wife, and their daughter had been living with his in-laws because they could not afford a place of their own.  (Tr. 7028.) Plaintiff reported to the crisis line that he had "been feeling trapped and frequently suicidal" with his current living situation and wanted help with locating a homeless shelter.  (*Id.*)  Dr. Luis-Roig then observed as follows:

> [Patient] . . . has been having anger outbursts at home to the point where he was [screaming] [at] his 3-year-old daughter last night [and] he became very depressed and called the crisis hotline[.]  [H]e had thoughts of cutting his wrist but he also admits that he's been having chronic suicidal thoughts [and] that he has anonymously contacted the crisis line on several occasions because he has been having on and off suicidal ideations.  He also admits that he[] [has] had several plans of how to hurt himself.

(Tr. 7034.)  Dr. Luis-Roig determined that Plaintiff required inpatient care and was transferred via ambulance to Wuesthoff Hospital where he was Baker Acted.  (Tr. 7034, 7023-26; *see also* Tr. 6881-96 (evidencing Plaintiff was treated at Wuesthoff Hospital from June 8 to June 10, 2017 due to suicidal ideation and PTSD).)

At a follow-up appointment with Dr. Luis-Roig on July 12, 2017, Plaintiff stated that some days were better than others, but he had a lot of

anger and did not want to be around people.  (Tr. 7369.)  Plaintiff stated that the Fourth of July was bad for him and that he "get[s] [the] flight or fight" response.  (*Id.*)  He also reported getting easily angry and that while his wife understood, his mother-in-law did not.  (*Id.*)  He also stated, "My fibromyalgia is upsetting me because I can't pay attention and my wife and her parents get angry at me.  Like putting the trash can in the house.  I am just not there." (*Id.*)  Plaintiff also reported, *inter alia*, that Bupropion "has been helping the depression" and requested an increase in dose.  (*Id.*)  Dr. Luis-Roig noted that Plaintiff still experienced "sadness with episodes of worthlessness and hopelessness" and that he had suicidal ideations a few days prior after having an argument at home with his family.  (*Id.*)  Plaintiff's depression and anxiety were rated as 8 out of 10.  (Tr. 7370.)  An MSE revealed normal findings, except Plaintiff's mood was depressed and anxious, and his affect was tense.  (Tr. 7374.)  Dr. Luis-Roig listed Plaintiff's diagnoses as chronic PTSD and Major Depressive Disorder, recurrent and severe without psychotic features, and noted that Plaintiff continued to be on a "suicide flag" as he continued to have episodes of sadness, hopelessness, worthlessness, and suicidal ideations, although he denied any plans or intentions of hurting himself.  (Tr. 7374-75.)

Plaintiff missed an appointment with Dr. Luis-Roig on July 20, 2017 because he did not feel well due to fibromyalgia (Tr. 7356), but presented for

13

a follow-up appointment on August 2, 2017.  (Tr.7339.)  Plaintiff reported

taking his medications but complained that the stress was causing "crippling

anxiety" and that he had to go to the emergency room due to a panic attack.

(*Id.*)  Dr. Luis-Roig noted:

> [Patient] . . . continues to be extremely depressed [and][,]
> although he denies any suicidal ideations[,] [he] has been
> experiencing panic attacks due to the increased stress at home
> which is multifactorial, including problems with his . . . chronic
> pain and [not] being able to be active and contribute[] to his
> children's child[-]rearing responsibilities, and financial
> difficulties.  He has had a partial response to medication but
> continues to exhibit symptoms of anxiety, PTSD, depression
> secondary to pain, finances, martial conflicts, and family stress.
> He is tolerating his medication well without any overt side
> effects.

(Tr. 7344.)  Plaintiff was to continue taking his medication and to return in

one to two weeks, or sooner if necessary.  (*Id.*)

On September 5, 2017, Plaintiff complained to Dr. Luis-Roig that he

experienced widespread body pain which worsened in the afternoons and

made him "grouchy."  (Tr. 7291.)  Plaintiff stated that acupuncture helped his

joint pain but not the fibromyalgia pain.  (*Id.*)  An MSE revealed normal

findings, except Plaintiff's mood was "depressed."  (Tr. 7296.)  Dr. Luis-Roig

noted that Plaintiff showed some improvement, but still had "periods of

hopelessness associated [with] his physical pain" and "seem[ed] to be

tolerating his medications well without any side effects."  (Tr. 7297.)

Plaintiff's treatment goals were not met.  (*Id.*)

Dr. Luis-Roig's treatment notes dated September 21, 2017 indicate that Plaintiff "was making progress," seemed "a little bit less depressed," and was "excited about moving into his own home," but noted that "he continues to have a lot of physical pain . . . which impacts his mental health."[7]  (Tr. 7265.) On October 5, 2021, Dr. Luis-Roig noted that Plaintiff was a "very complex patient due to the pain level that he experiences," but that he reported he was better overall "than when he started treatment," that he continued to "struggle with fatigue, chronic pain, and episodes of anger which then lead [sic] him to feel useless and worthless but denies any plans or intentions of hurting himself."  (Tr. 7247.)

Dr. Luis-Roig's treatment notes dated October 12, 2017 also indicate that Plaintiff had shown improvement in the preceding three weeks (Tr. 7216), but became ill after mixing alcohol with his medications and had also been experiencing a rapid heartbeat since increasing his dose of Bupropion. (Tr. 7222.)  According to Dr. Luis-Roig, Plaintiff also had "periods of hopelessness and helplessness which are associated with his pain and his physical inactivity" but he "adamantly denie[d] any suicidal thoughts or plans or intentions of hurting himself."  (*Id.*)  Plaintiff's MSE was generally

---

[7] On September 20, 2017, Dr. Luis-Roig noted that Plaintiff's "depression is a lot of times made worse by physical pain and therefore Lyrica will benefit the patient and overall his health and mental state," and that the benefits of prescribing Lyrica outweighed the risks.  (Tr. 7271.)

normal, with euthymic mood and brighter affect.  (*Id.*)

Treatment notes from Dr. Luis-Roig dated November 16, 2017 also indicate that Plaintiff "overall has been doing better [and] [is] responding to medication but continues to have conflicts in his marriage over responsibilities at home with caring for the children." (Tr. 7199.)  Dr. Luis-Roig also noted that Plaintiff was tolerating his medication well and that he seemed "to be benefiting from treatment." (*Id.*)  Plaintiff's MSE was normal, but his mood was anxious.  (Tr. 7198.)

On November 27, 2017, Plaintiff reported to Dr. Luis-Roig that he stopped taking his Lyrica, his pain had worsened, and that he could not "use marijuana all the time." (Tr. 7176.)  Plaintiff stated that it was his goal to take less medication and he saw this as a "positive" because he had been losing weight, but that he was in more pain.  (*Id.*)  He also complained, "My wife gets mad at me when I don't want to go places because I don't want to be around people." (*Id.*)  Plaintiff also stopped taking prazosin as "he no longer has nightmares." (*Id.*)  An MSE was generally normal, except his mood was depressed.  (Tr. 7181.)

Plaintiff presented for a follow-up appointment with Dr. Luis-Roig on December 20, 2017, complaining that he had been "feeling really sick lately" and that his pain level was a 9.  (Tr. 7140.)  Plaintiff stated that he had gained 30 pounds on Lyrica and that it made him feel suicidal.  (*Id.*)  Plaintiff

reported feeling hopeless and worthless because he continued "to be in a lot of physical pain," which was not improving.  (*Id.*)  Dr. Luis-Roig noted that Plaintiff "sometimes uses prescribed marijuana to control his pain but it makes him loopy and therefore he does [not] always want to take it."  (Tr. 7141.)  Plaintiff felt "quite depressed and rate[d] his depression as 8 out of 10."  (*Id.*)  Plaintiff's MSE was normal but his mood was depressed.  (Tr. 7146.)  Dr. Luis-Roig noted: "[Patient] continues to suffer from depression mostly secondary to physical pain[,] inability to help his wife with the children[,] and physical inactivity leading to feelings of worthlessness and [he] feels hopeless that he will ever feel well again."  (*Id.*)  She also noted that Plaintiff "seem[ed] to be responding well to [the] current medication regimen," and was "tolerating medication well without any overt side effects," but his treatment goals were not met.  (*Id.*)

At a follow-up appointment on April 10, 2018, Dr. Luis-Roig noted that Plaintiff had been "feeling depressed and despondent as he has been feeling sick for the past 2 weeks."  (Tr. 7622.)  Plaintiff was "also feeling more hopeful since his parents were moving to Florida."  (*Id.*)  Dr. Luis-Roig also reviewed Plaintiff's safety plan, noting that he was not at "an acute risk of harming [him]self or others."  (Tr. 7626.)  Dr. Luis-Roig also noted that Plaintiff's PHQ-9 depression test score was 21, which was indicative of severe depression.  (Tr. 7625.)  Plaintiff's MSE was also normal, except his mood

was depressed.  (*Id.*)  It was also noted that the treatment goals were not met.  (Tr. 7626.)

On May 2, 2018, Plaintiff presented for a follow-up appointment with Dr. Luis-Roig, complaining of increased pain after he stopped taking his Methotrexate due to problems with his kidneys and liver.  (Tr. 7594-95.) Plaintiff reported that the increase in pain also triggered his depression and he felt fatigued and had body aches.  (Tr. 7595.)  Plaintiff's PHQ-9 depression score was 18 (indicative of moderately severe depression) and his GAD-7 anxiety score was 17 (indicative of severe anxiety).  (Tr. 7595, 7598.)  A PTSD checklist was also administered, which revealed trauma-related symptomology.  (Tr. 7898.)  An MSE also revealed normal findings; however, Plaintiff's mood was depressed and anxious.  (*Id.*)  Dr. Luis-Roig noted that Plaintiff's PHQ-9 score of 18 was consistent with moderate to severe depression and he had "minimal response to medication, which is mostly related to his physical/medical history which seems to be affecting his overall mental health."  (Tr. 7599.)  She also noted, *inter alia*, that Plaintiff "developed increased liver enzymes which limits continuation of the psychotropic medications."  (*Id.*)  It was again noted that the treatment goals were not met.  (*Id.*)

At a follow-up appointment with Dr. Luis-Roig on August 29, 2018, Plaintiff complained that he did not feel "too good," felt that he was

"deteriorating" health wise, and would "get very irritable." (Tr. 7541.)
Plaintiff reported restarting on duloxetine per his rheumatologist, but
"stopped taking Mirtazapine and Bupropion because they did not help with
his mood." (*Id.*) Plaintiff also reported using medical marijuana which
helped his pain and PTSD symptoms but made him "loopy" and affected his
memory. (*Id.*) Plaintiff also complained of worsening pain, fatigue,
forgetfulness, worthlessness and hopelessness, and at times felt "life is not
worth living" but denied suicidal ideations. (*Id.*) Plaintiff's PHQ-9 score was
19 (indicative of moderately severe depression) and his GAD-7 score was 17
(indicative of severe anxiety). (Tr. 7544.) His MSE was normal, except his
mood was depressed and he was forgetful at times. (*Id.*) Dr. Luis-Roig noted
that Plaintiff presented with moderate to severe symptoms of depression with
"multifactorial" current symptomology, including sleep apnea, fibromyalgia,
and chronic pain. (Tr. 7545.) It was noted that Plaintiff's treatment goals
were not met and Plaintiff was counseled that THC may be causing
worsening memory, cognition, depression, and increased appetite. (*Id.*)

On October 31, 2018, Plaintiff complained to Dr. Luis-Roig of worsening
pain and stated it was the worst pain he had experienced in the previous
three years. (Tr.7507.) Plaintiff also reported "passive suicidal thoughts"
and noted that the medication "helped with [his] rage." (Tr. 7507.) He also
endorsed decreased interest and pleasure in activities, motivation problems,

worthlessness, feeling tired and with no energy, and trauma-related symptoms.  (Tr. 7507-08.)   Plaintiff's MSE was normal but his mood was depressed.  (Tr. 7510.)

In a follow-up appointment with Dr. Luis-Roig on November 28, 2018, Plaintiff stated that the medication had been helping and that he felt "way more agitated and snappy" when he forgot to take it.  (Tr. 7481.)  Plaintiff reported that his depression was getting better but that his mood fluctuated "depending on his pain level."  (*Id.*)  He reported there were days he felt sick and could not get out of bed.  (*Id.*)  He also reported feeling "hopeless about his medical condition" and that "nothing [was] helping [him] feel better." (*Id.*)  According to Dr. Luis-Roig, Plaintiff reported "benefitting from THC for pain, anxiety and glaucoma."  (*Id.*)  He denied suicidal ideations but stated he had been arguing a lot with his wife and that she "wants me to go places and I sometimes feel sick."  (*Id.*)  Plaintiff endorsed decreased interest and pleasure in activities, motivation problems, feeling worthless, tired, and without energy, and trauma-related symptoms.  (Tr. 7481-82.)  His MSE was normal, but his mood was depressed.  (7484.)  Dr. Luis-Roig noted that in addition to Plaintiff's mental health diagnoses (PTSD, Major Depressive Disorder, recurrent and severe without psychotic features, and partner/relationship problems), he also suffered from psoriatic arthritis and fibromyalgia, which contributed to his fatigue and pain, "both of which

impact fluctuations in mood." (Tr. 7485.)  She increased Plaintiff's duloxetine to help with fibromyalgia pain and noted that treatment goals had not been met. (*Id.*)

Treatment notes from Dr. Luis-Roig dated January 31, 2019 indicate that Plaintiff reported he was "not feeling good" and was in a lot of pain the day prior. (Tr. 7664.)  Plaintiff reported increased pain, nightmares, and difficulty sleeping. (*Id.*)  He reported, *inter alia*, that his "depression continues and his mood fluctuates depending on his level of pain." (*Id.*)  Plaintiff denied hopelessness and suicidal ideations. (*Id.*)  Plaintiff stated that his relationship with his wife improved, and that although he "loves spending time with his children" and had "been spending more time with [them][,] they trigger him." (*Id.*)  He also noted that with "his current level of pain[,] all he wants to do is sleep." (*Id.*)  Plaintiff stated that duloxetine helped his pain and mood and he also continued to use medical marijuana to help manage his pain. (*Id.*)  Plaintiff's MSE was normal, but his mood was depressed. (Tr. 7667.)  Dr. Luis-Roig stated that pain continued to be a contributing factor to Plaintiff's disability and depression. (Tr. 7667-68.)  She also decreased Plaintiff's duloxetine dosage due to elevated liver enzymes but decided not to discontinue it since it helped with his pain. (Tr. 7668.)  However, Plaintiff's liver function tests (LFTs) would have to be repeated in six to eight weeks. (*Id.*)  She also noted that Plaintiff's treatment goals were

not met.  (*Id.*)

A telephonic treatment note from Dr. Luis-Roig dated March 23, 2019 indicates that, due to elevated liver enzymes, Plaintiff would be weaned off of duloxetine and started on sertraline to treat his depression and PTSD.  (Tr. 7872-73.)  An MSE from that date also revealed normal findings, except Plaintiff's mood was depressed.  (Tr. 7873.)  On April 4, 2019, Plaintiff missed an appointment with Dr. Luis-Roig.[8]  (Tr. 7863.)

### 2. Medical Source Questionnaire (Mental) by Dr. Luis-Roig

In a Medical Source Questionnaire (Mental) dated August 29, 2017, Dr. Luis-Roig, checked a box indicating that Plaintiff's "ability to understand, remember, and carry out instructions" was not affected by his impairment. (Tr. 7118.)  However, Dr. Luis-Roig proceeded to evaluate Plaintiff's restrictions in work-related mental activities as though she had answered "yes" to the preceding question.  (*Id.*)  Dr. Luis-Roig opined that Plaintiff had no restrictions in understanding, remembering, and carrying out simple instructions.  (*Id.*)  She also opined that Plaintiff had mild restrictions in the "ability to make judgments on simple work-related decisions"; moderate

---

[8] A nurse's no-show/cancellation note indicates that Plaintiff was contacted and that he reported forgetting about the appointment.  (Tr. 7864.)  Plaintiff also reported as follows: "Veteran states it has been difficult since he was taken off many medications due to his high liver enzymes.  He states he gets triggered more easily and has increased chronic pain."  (*Id.*)

restrictions in understanding, remembering, and carrying out complex instructions; and moderate restrictions in the ability to make judgments on complex work-related decisions.  (*Id.*)  She did not list the factors that supported her assessment.  (*Id.*)

Next, the Questionnaire asked whether Plaintiff's "ability to interact appropriately with supervision [sic], co-workers, and the public, as well as respond to changes in the routine work setting," was affected by his impairments, but Dr. Luis-Roig left this question blank.  (*Id.*)  Instead, she went on to evaluate Plaintiff's restrictions in work-related activities as though she had answered "yes."  (*Id.*)  Dr. Luis-Roig indicated that Plaintiff had extreme restrictions in his ability to interact appropriately with the public, moderate restrictions in his ability to interact appropriately with supervisor(s) and with co-workers, and marked restrictions in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  (*Id.*)  Although asked to identify the factors supporting her assessment, Dr. Luis-Roig left this portion of the Questionnaire blank.  (Tr. 7119.)  Dr. Luis-Roig also opined that no other capabilities were affected by Plaintiff's impairments.  (*Id.*)  The Questionnaire then asked about the date the limitations were first present, to which Dr. Luis-Roig responded: "inability to interact with public."  (*Id.*)  Dr. Luis-Roig also opined that Plaintiff would not be able to sustain an eight-hour workday, five days a

week, but failed to provide an explanation for this opinion.  (*Id.*)  She also

opined that Plaintiff would be able to manage benefits in his own best

interest.  (*Id.*)

##### D.    The ALJ's Decision

At step two, the ALJ found that Plaintiff had the following severe

impairments: spine disorder, lumbosacral back strain with arthritis,

degenerative arthritis of the cervical spine, bilateral shoulder bicipital

tendonitis, fibromyalgia, right foot heel spur, left foot heel spur, psoriasis,

obstructive sleep apnea, bilateral tinnitus, major depressive disorder, and

post-traumatic stress disorder ("PTSD").  (Tr. 17.)  At step three, the ALJ

found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed

impairments.[9]  (Tr. 25-26.)

Then, before proceeding to step four, the ALJ determined that Plaintiff

had the RFC to perform sedentary work, but with the following limitations:

> [H]e can frequently reach overhead, climb ramps and stairs,
> kneel, crouch, and crawl, but he can never climb ladders, ropes,
> or scaffolds.  He can have frequent exposure to work-place
> hazards, such as unprotected heights, moving mechanical parts,
> and operating heavy machinery.  He is limited to working in an
> environment with moderate noise, as defined in the SCO of the
> DOT.  He can understand, remember, and carry out rote and

---

[9] At step three, the ALJ stated, *inter alia*, that she "evaluated the claimant's fibromyalgia consistent with SSR 12-2p, but [found] that it [did] not equal a listing alone, or in combination with another impairment."  (Tr. 19.)

routine instructions, or tasks, that require little independent judgment or decision-making, that can be learned from a short demonstration period of less than 30 days.  The claimant should not work in fast[-]paced assembly line[-]type environment, or do work that has stringent production requirements, or one that is strongly quota driven.  He can occasionally work in coordination, or in tandem, with co-workers.  He can frequently appropriately interact with supervisors, but can only occasionally interact with co-workers and the general public.  He can make simple work-related decisions and adapt to occasional, gradual, routine, and predictable workplace changes, independently.

(Tr. 21.)  In making these findings, the ALJ claims she considered all of

Plaintiff's symptoms, the extent to which these symptoms could reasonably

be accepted as consistent with the objective medical evidence and other

evidence, as well as the opinions of record.  (Tr. 21-27.)

The ALJ summarized Plaintiff's symptoms, in part, as follows:

At the hearing held on March 26, 2018, the claimant testified that he cannot work because of his fibromyalgia pain that he rated at 7/10 on the pain scale for the most part.  He had three or four days a week where his pain is at an 8 or 9 out of 10.  None of the fibromyalgia medications have helped.  He has chronic fatigue and it is hard for him to do even simple things around the house, such as washing dishes, as it is painful to bend over and use his hands.  The claimant has difficulty walking on bad days due to pain in his legs, knees, feet, and lower spine.  He gets joint pain, and he has had surgery on both knees.  He has to take rest periods throughout the day.  The claimant pushes the stroller to help him walk.  His daughter holding his hand hurts him.  The claimant tries to alternate sitting and standing.  He can stand or walk for 5 to 10 minutes at one time and then he must sit.  He has to stretch after sitting for 20 to 30 minutes.  The claimant lies down most of the day.

The claimant's PTSD triggers include certain sounds, such as sirens, that remind him of being attacked.  He has nightmares of

being attacked and gets panic attacks when he even thinks of going into crowds, which can be even four to five people.  The claimant stated that he has a hard time talking to people and has anger issues.  He yells at his daughter when she gets persistent about holding his hand or sitting next to him.  He yells at his wife frequently because she wants him to do something [sic] that he cannot do.  The claimant also has road rage, but a two[-]month[] PTSD program helped him understand his triggers.  He feels unsafe around people and has yelled at people when they are too close.  He will [] go to the store with his wife, but he stays in the car because he does not feel well.  The claimant's sleep has improved with Seroquel but it is hard for him to wake up.  At the most recent hearing held June 7, 2019, the claimant testified that he has trouble getting along with others and that he isolates himself, even from his own family.  He spends most of the time in his bedroom.

(Tr. 21-22.)  The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 22.)

Specifically, the ALJ found that, in terms of Plaintiff's "spine disorder, lumbosacral back strain with arthritis, degenerative arthritis of the cervical spine, bilateral shoulder bicipital tendonitis, fibromyalgia, bilateral heel spurs," while the evidence documented some issues, "it [did] not support the alleged severity of the claimant's symptoms and limitations."  (*Id.*)  The ALJ pointed to improvement in Plaintiff's morning stiffness with stretching and walking, normal "[p]lain radiographs," and "diffuse tender points throughout

with no synovitis or effusions." (*Id.*)  Additionally, the ALJ noted as follows:

> X-rays of the bilateral hands were normal with no evidence of
> arthritic or inflammatory change, and [X]-ray of the sacroiliac
> joint were unremarkable.  There was no acute osseous
> abnormality seen in the cervical spine [X]-ray, and [an] [X]-ray of
> the bilateral feet showed pes planus without evidence of erosive
> arthropathy or acute osseous abnormality.  An MRI of the
> cervical spine showed minimal age[-]related degenerative
> changes with no significant canal or foraminal stenosis (2F/16-
> 19).  The claimant's biopsy showed that he had psoriasis at his
> June 2016 follow up, but his B27 was negative and the
> inflammatory markers were unrevealing and his MRI and [X]-
> rays demonstrated non-inflammatory mechanical changes
> without active inflammatory arthritis.  He noted significant
> improvement in his diffuse joint pain since starting methotrexate
> four weeks earlier, particularly his neck range of motion, which
> allowed him to type for a longer period.  His April 2016 lumbar
> MRI showed mild age[-]related degenerative changes with a
> small right paracentral protrusion at L5-S1 that displaced the
> right S[I] nerve root.  The claimant's fibromyalgia was stable, and
> his prognosis was good in September 2016.  He was prescribed
> Lyrica at that time.  The claimant reported worsening body pain
> and fibromyalgia in December 2016, but improved joint pain and
> stiffness on methotrexate with diffuse tenderness to fibromyalgia
> pressure point[s] and full range of motion on examination (2F,
> 3F).  More recent medical imaging continues to show only mild
> degenerative changes (17F/3).
>
> The claimant returned to his rheumatologist for follow[-]up in
> June 2017.  He was limited in his daily activities because of
> fatigue that he attributed to fibromyalgia.  There was no
> cyanosis, clubbing, or edema of the extremities, and his strength
> was 5/5 with 2+ symmetric reflexes.  He had decreased shoulder
> range of motion to active movement with pain on palpitation.  He
> was able to make good fists.  There was right MCP tenderness
> with swelling at 2 and 3 and left PIP tenderness and MCP
> tenderness with no swelling.  He had right knee swelling with
> pain and limited range of motion, and right ankle swelling with
> pain and no limited range of motion.  There was normal cervical,
> thoracic, and lumbar range of motion.  The claimant's subsequent

examination in August 2017 was generally within normal limits other than multiple tender points throughout his body. The claimant's Lyrica dose was decreased to help his weight loss (10F, 13F).
. . .

The claimant described 8/10 pain at his September 2017 primary care visit. He stated that he was unable to decrease his Lyrica dose as it was the only medication that helped with his pain, and he stated that his depression was stable. He was tender to palpitation in all muscles in the upper and lower extremities, over the spinous processes of the cervical, thoracic, and lumbar spine, with extreme tenderness over the SI joints bilaterally. His lower extremity strength was 4/5 and slightly stronger on the left to hip flexion. Plantar and dorsiflexion were intact, as were his reflexes. There was moderate to severe tenderness to palpitation that was worse at the right paralumbar and S[I] with tenderness over the right greater trochanter and full range of motion of the hip. He was started on a trial of Baclofen in December 2017 and was then started on gabapentin, which helped a little in February 2018 (13F, 14F). . . . Additionally, more recent physical examinations show that the claimant walks with a normal gait (10F/80, 13F/194, and 16F/220).

(Tr. 22-24.)

The ALJ then found that Plaintiff's statements about "the intensity, persistence, and limiting effects of his symptoms, . . . are inconsistent because while he was diagnosed with and treated for the conditions described above, he responded relatively well to conservative treatment, and imaging studies and physical examination[s] showed findings that did not comport with his reported functional limitations." (Tr. 24.) The ALJ further noted that:

[T]he claimant's laboratory studies were within normal limits

with no evidence of an inflammatory process. The claimant was treated conservatively for his bilateral shoulder impingement with injections in each shoulder, physical therapy, and acupuncture. While his upper extremity strength was noted to be 4/5 at some examinations and 5/5 at others with some limitations in range of motion, there was no evidence of significant neurological deficits, and no recommendations for a more aggressive treatment. Similarly, while the claimant's lumbar MRI showed mild degenerative changes and small right paracentral protrusion at L5-S1 that displaced the right SI nerve root with limited range of motion and examinations that demonstrated 4/5 lower extremity strength, the claimant has been treated conservatively with anti-inflammatory and pain medications, physical therapy, and acupuncture. Despite 4/5 upper and lower extremity strength, the neurologist who evaluated him for gait disturbance found that his reflexes were symmetric, his sensation was intact with normal rapid alternating movements and finger to nose with negative Romberg and a negative lower extremity EMG NCS. As such, there is no indication that the claimant suffers from impingement or chord compression. It seems that the majority of the claimant's complaints related to his pain and joint and muscle tenderness is related to his diagnosis of fibromyalgia. The claimant testified that he did not respond to medications for fibromyalgia, however the record indicates that he reported that Lyrica was the only medication that helped his symptoms and there were times when his fibromyalgia was stable. The claimant also reported some benefits with a combination of Baclofen and gabapentin and after engaging in water exercise (17F/92 and 19F/2). The claimant is noted to have bilateral heel spurs and has been using orthopedic inserts (4F/2311). Additionally, more recent physical examinations show that the claimant walks with a normal gait (10F/80, 13F/194, and 16F/220). He is also noted to have good range of motion in his shoulders . . . .

The claimant has been diagnosed with moderate obstructive sleep apnea and has been prescribed a CPAP machine, but treatment notes show that he does not use it (16F/27, 16F/130, and 17F/70). However, when he has used it, he reported feeling more rested (4F/1462). In May 2018, the claimant reported that his sleep was better and he had been sleeping 5 to 6 hours a night (16F/184).

The exertional and mental limitations account for any fatigue associated with the claimant's obstructive sleep apnea.

(Tr. 24-25.)

With respect to Plaintiff's mental impairments, the ALJ noted as follows:

> [T]he claimant has been diagnosed with moderate to severe depression.  He is also noted to experience PTSD.  The claimant frequently reported suicidal thoughts, and he was Baker Acted for two days in June 2017 on one occasion as his suicidal thoughts included a plan to slit his wrists, however the suicide flag was removed from his chart, and he regularly expressed [] passive [suicidal] thoughts with no intent because of his wife and particularly his children (13F/131).  The claimant did respond to medication adjustments with improvement in his mood swings, irritability, sleep, and nightmares.  In August 2017, the claimant's PTSD was noted to be improving and his anger was relatively well controlled (13F/191).

(Tr. 25.)  Nonetheless, the ALJ noted that Plaintiff "has been consistent in following treatment and taking prescribed medication, and there has been noted improvement in his symptoms in spite of his testimony, which indicates that he experiences significant medication side effects, panic attacks, and an inability to function from a mental standpoint."  (*Id.*)  According to the ALJ:

> Treatment notes throughout the period at issue show that the claimant has been prescribed various medications including Zoloft, Lyrica, and Bupropion for his depression with good results and his depression has been noted as stable. (4F/1201, 4F/1608, 10F/57-59, 13F/152-154, and 13F/250)  He also participates in VE [sic] therapy and reported that his therapy also helped (10F/167).  Mental status examinations show that the claimant['s] attention, concentration, and memory are normal, and the claimant['s] thought processes are linear and goal

oriented (13F/177, 13F/225, 13F/255, 16F/99, 16F/133, 16F/214, 17F/30, 17F/132, and 21F/28).  He is noted to be calm and cooperative at his treatment appointments (21F/52).

(*Id.*)

With respect to the opinion evidence of record, the ALJ accorded some weight to the opinion of Dr. Luis-Roig, Plaintiff's treating psychiatrist, explaining as follows:

> [T]he treating psychiatrist completed a medical source statement in August 2017, checking the box that indicated that the claimant's ability to understand, remember, and carry out instructions was not affected by his impairment.  He [sic] completed the questions (as if it [sic] were marked "yes") stating that he had no limitations [in] understanding, remembering, and carrying out instructions, mild difficulties [in] making judgments on simple work related decisions, and moderate limitations [in] understanding, remembering, and carrying out complex instructions and making judgments on complex work[-]related decisions.  He had extreme limitations [in] interacting appropriately with the public, moderate limitations [in] interacting appropriately with supervisors and coworkers, and marked limitations [in] responding appropriately to usual work situations and changes in routine work setting.  He would not be able to sustain an 8-hour work-day, five days a week (12F).

(*Id.*)  The ALJ gave "some weight" to Dr. Luis-Roig's opinions "with regard to the claimant's ability to understand, remember, and carry out simple job instructions and mild limitations [in] making judgments on simple work decisions" because "this correlates with the claimant's ability to perform simple[,] routine tasks."  (Tr. 25-26.)  However, the ALJ determined that there was no support for "an extreme limitation[] interacting appropriately

with the public." (Tr. 26.)  The ALJ reasoned as follows:

> Mental status examinations show that the claimant's attention, concentration, and memory are normal, and the claimant's thought processes are linear and goal oriented [].  He is also noted to be calm and cooperative at his treatment appointments [].  The psychiatrist did not support his conclusory statement that the claimant could not sustain an 8[-]hour workday[,] five days a week.

(*Id*.)  Thus, the ALJ found that Dr. Luis-Roig's opinion was "not fully supported by treatment notes and [could not] be given great weight."  (*Id*.)

The ALJ then gave little weight to the State agency medical consultant's findings that Plaintiff could perform a limited range of light work, finding that light work exceeded his physical capabilities and noting that the consultant "did not have an opportunity to examine" Plaintiff or "review the evidence received at the hearing level."  (Tr. 26.)

The ALJ then gave "partial weight" to the opinion of the State agency psychological consultant, who opined that Plaintiff could "recall, understand, and follow simple[,] routine[,] and complex instructions and tasks and sustain attention and concentration for simple[,] repetitive routine tasks," because it was "supported by the evidence of record and with moderate limitations in his ability to get along with co-workers and peers [which] correlates with" Plaintiff's RFC.  (*Id*.)  The ALJ also reasoned that this opinion "was consistent with the mental status examinations show[ing] that the claimant['s] attention, concentration, and memory are normal, and the

claimant['s] thought processes are linear and goal[-]oriented." (*Id.*)  However, the ALJ found that "the claimant can only occasionally interact with supervisors and co-workers, contrary to the psychological consultant's finding that he was not significantly limited in those areas, which fully accounts for the claimant's alleged trouble getting along with others." (*Id.*)

The ALJ also gave "slight, if any, weight" to Plaintiff's wife's Third-Party Function Reports from June 2017 and March 2017, in which she stated that Plaintiff "was in pain all the time, could not sleep due to night terrors, napped frequently, and had social anxiety." (*Id.*)  According to the ALJ, Plaintiff's wife also reported:

> He needed reminders to take care of his personal needs as he was forgetful, had gained weight, was irresponsible with money, could not pay bills or count change.  He was limited in all areas, could walk a couple of blocks before needing to rest for 5 minutes, and could pay attention for less than 2 minutes.  He did not get along with others and was paranoid.  He had suicidal thoughts and did not have hobbies [].

(*Id.*)  The ALJ found that while Plaintiff's wife's statements "echoed her husband's allegations," there was "no basis on which to afford [her] opinion more than slight, if any, weight" because "the evidence of record, taken as a whole, contradicts this statement." (*Id.*)

The ALJ also gave little weight to the VA's 100% disability rating of Plaintiff, in part because it was based on different criteria and did "not provide any specific functional limitations in vocational terms, or determine

whether the claimant is able to engage in an ongoing and consistent basis as defined" by the SSA.  (Tr. 26-27.)

Then, at step four, the ALJ determined that Plaintiff could not perform any past relevant work.  (Tr. 27.)  At step five, the ALJ found that, based on Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert ("VE"), Plaintiff could perform a limited range of sedentary work (such as a table worker, fruit sorter, and final assembler) and that this work existed in significant numbers in the national economy.  (Tr. 27-28.) The ALJ explained that the VE testified that these representative jobs "do not require interaction with the general public and they only require occasional interaction with co-workers and supervisors."  (Tr. 28.)  The ALJ also noted that the VE explained that even if Plaintiff "were further restricted to no tandem work, these jobs would still be available, but that the job numbers would be reduced by ten percent."  (*Id.*)  The ALJ further noted that the representative jobs involve "simple, routine, repetitive work so they are not affected with [Plaintiff] being restricted to no substantial changes in [] routine and procedures."  (*Id.*)  Thus, the ALJ found that Plaintiff was not disabled during the relevant period.  (Tr. 28-29.)

## III.   Analysis

As noted above, Plaintiff takes issue with the ALJ's assessment of the treatment records and opinions of Dr. Luis-Roig, Dr. Vuyyuru, and Ms.

Devine.  The Court agrees with Plaintiff that the ALJ's failure to adequately evaluate the treatment records and opinion of Dr. Luis-Roig and her failure to address Plaintiff's reported prescribed use of a cane constitutes reversible error, as discussed below.  Therefore, the Court does not address the remaining issues in detail.

### A. The ALJ's Evaluation of Dr. Luis-Roig's Opinion

"The [ALJ] must specify what weight is given to a treating physician's opinion and any reason for giving it no weight . . . ."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  While an ALJ's RFC determination does not need to include or account for every limitation found in a medical opinion, "[t]he ALJ is required to provide a reasoned explanation as to why he chose not to include a particular limitation in his RFC determination." *Knoblock v. Colvin*, No. 8:14-cv-646-MCR, 2015 WL 4751386, at *3 (M.D. Fla. Aug. 11, 2015) (internal citations and quotation marks omitted).  As such, "reversal is required where an ALJ fails to sufficiently articulate the reasons supporting his decision to reject portions of a medical opinion while accepting others." *Knoblock*, 2015 WL 4751386, at *3 (citing *Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012)).

The Court finds that the ALJ's reasons for discounting the opinion of Dr. Luis-Roig are not supported by substantial evidence.  In discounting Dr. Luis-Roig's opinion that Plaintiff had extreme limitations interacting

appropriately with the public, the ALJ noted that MSE findings "show that the claimant['s] attention, concentration, and memory are normal and that the claimant['s] thought processes are linear and goal oriented." (Tr. 26.) The ALJ also reasoned that Plaintiff was noted to be "calm and cooperative at his treatment appointments." (*Id.*) However, these reasons do not constitute substantial evidence.

As the Eleventh Circuit recently reiterated, "[b]efore an ALJ may reject a treating physician's opinions as inconsistent with other medical findings in the record, he or she must identify a 'genuine inconsistency.'" *Simon v. Comm'r, Soc. Sec. Admin.*, 1 F.4th 908, 921 (11th Cir. 2021) (quoting *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1262 (11th Cir. 2019)). "It is not enough merely to point to positive or neutral observations that create, at most, a trivial and indirect tension with the treating physician's opinion by proving no more than that the claimant's impairments are not all-encompassing." *Id.* (quoting *Schink*, 935 F.3d at 1263) (internal quotations omitted). Thus, "when a claimant has been diagnosed with the types of mental and emotional disorders at issue here, highly generalized statements that the claimant was 'cooperative' during examination, that he exhibited 'organized speech' and 'relevant thought content,' or that he showed 'fair insight' and 'intact cognition,' ordinarily will not be an adequate basis to reject a treating physician's opinions." *Simon*, 1 F.4th at 921 (citing *Schink*,

935 F.3d at 1262). "Nor is it enough to say that the claimant is 'intelligent enough to understand and follow orders and solve problems,' such as serial sevens, because 'highly intelligent and able people do fall prey to crippling depression.'" *Id.* (quoting *MacGregor*, 786 F.2d at 1053-54).

Moreover, "when evaluating a claimant's medical records, an ALJ must take into account the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of a workplace." *Id.* "[F]or a person . . . who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." *Id.* (quoting *Morales v. Apfel*, 255 F.3d 310, 319 (3d Cir. 2000)); *see also Castro v. Acting Comm'r of Soc. Sec.*, 783 F. App'x 948, 956 (11th Cir. 2019) ("Without more, we cannot say that [the treating physician's] observations of Castro's judgment, insight, thought process, and thought content in a treatment environment absent work stressors were inconsistent with his assessment about the limitations she would face in a day-to-day work environment."). In *Simon*, the Eleventh Circuit further noted:

> In our view, it goes almost without saying that many people living with severe mental illness are still capable of eating, putting on clothes in the morning, and purchasing basic necessities. None of those activities, however, say much about whether a person can function on a work environment—with all of its pressures and obligations—on a sustained basis. Without some reasonable explanation from the ALJ as to why completing

basic household chores[10] is inconsistent with a finding of
disability, this evidence was not sufficient to discredit [the
treating physician].

*Simon* at 922.

Thus, to the extent the ALJ points to normal MSE findings in

discounting the opinion of Dr. Luis-Roig, these reasons are not supported by

substantial evidence.  The ALJ's reasoning is inconsistent with and

unsupported by the evidence of record, which tends to support Dr. Luis-Roig's

opinion regarding Plaintiff's extreme restriction interacting with the public,

marked restriction in his ability to respond appropriately to usual work

situations and to changes in a routine work setting, and his inability to

sustain an eight-hour workday, five days a week in light of his ongoing PTSD

symptoms, anger outbursts, severe depression, and pain.  *See Schink*, 935

F.3d at 1267-68 (noting that it was expected that the claimant, who suffered

from bipolar disorder, would experience good days and bad days and that,

based on the episodic nature of the his mental impairment, "the ALJ's

citation of the good days as evidence of no disability did not support a finding

that [he] did not suffer from a severe impairment" or that "his doctor's

---

[10] Here, the record consistently shows that Plaintiff was unable to help his
wife with any household chores and could not help take care of his children, and
that when he did, he experienced anger outbursts as his children "triggered" him.
(*See, e.g.*, 7146, 7199, 7323, 7664; *but see* Tr. 7166 (noting, on December 12, 2017,
that Plaintiff reported he cared for his baby once a week, stating "that is all I can
handle").)

treatment opinions [were] inconsistent with the record"); *see also* SSR 12-2p ("For a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'").

Here, the treatment records from the VA clinic, and from Dr. Luis-Roig in particular, indicate that Plaintiff had persistent issues with severe depression, anxiety, trauma-related symptoms, anger, isolation, suicidal ideation, as well as severe pain and fatigue in connection with his fibromyalgia and other conditions. (*See, e.g.*, 6812-15, 6873, 7028-35, 7199, 7297, 7334, 7374-75; *see also* Tr. 7247 (noting Plaintiff was a "very complex patient due to the pain level that he experiences").) Moreover, Plaintiff's PHQ-9 and GAD-7 test scores consistently revealed severe or moderately severe depression and anxiety, and symptoms of PTSD, even if his symptoms appeared to improve intermittently. (*See*, e.g., 6862-64 (noting, on April 18, 2017, a PHQ-9 score of 21 (indicative of severe depression) and a GAD-7 score of 20 (indicative of severe anxiety)); Tr. 7187-89 (noting, on November 16, 2017, a PHQ-9 score of 18 (indicative of moderately severe depression) and a PCL-5 score of 65 (indicative of very severe PTSD)); Tr. 7284 (noting, on September 19, 2017, a PHQ-9 score of 25 (indicative of severe depression) and a GAD-7 score of 21 (indicative of severe anxiety)); *see also* Tr. 7544, 7595-99, 7625, 7633 (noting high PHQ-9 and/or GAD-7 scores).)

In addition to the treatment notes from Dr. Luis-Roig, Plaintiff's other mental health providers also reported that Plaintiff suffered from severe mental health symptoms, which appeared to wax and wane or plateau over time.  (*See* Tr. 6593 (triage treatment notes from Plaintiff's treating psychologist, Dr. Arthur Sandowski, dated July 5, 2017, noting that Plaintiff reported that "Buproprion helped with energy" and he "liked it" but he still reported feeling depressed, "[p]ain is still a factor[,] PTSD is a factor[,] weight is a factor," and "that intrusive memories and nightmares are less frequent[,] but he still experiences hypervigilance, avoidance, irritability, feeling anxious in crowded place[s] and being frightened by loud noises."); Tr. 7323 (treatment note from Dr. Philpot, Plaintiff's treating psychologist, dated August 10, 2017, indicating that Plaintiff reported: "I keep getting activated. I lash out at my family, I yell at my family, I swat at my daughter before it's called for, I don't hurt her or leave marks, but it bothers my wife, and me too. Sometimes I just want to be on my own, but I want to have a relationship with my family.  I feel so bad physically sometimes I want to die, but I don't want to kill myself."); Tr. 7325 (treatment note dated August 10, 2017, revealing sad, irritable mood and restricted affect on MSE); Tr. 7584 (psychotherapy notes from Dr. Philpot dated June 12, 2018, noting that Plaintiff related as follows: "I have tried some of the getting out, in vivo exposure, but I feel bad physically so often that I just can't keep after it.  My

wife wanted me to watch the kids yesterday and I couldn't.  I just layed [sic] in bed and she was very upset.  She said I need to figure out a way to be with them and help more.  I get so irritated around the kids.  They demand my attention and me moving and that is difficult for me, so I feel like I am constantly failing."); Tr. 7878 (treatment note from Dr. Philpot dated February 28, 2019, indicating that Plaintiff reported: "I have been pretty irritable.  I had some liver problems so the[y] reduced my [medications].  I really would like to go fishing but I get so tired.  I hurt and I want to lay down.  When I push myself[,] I hurt worse and I will even bring myself to tears.  I would be willing to go to a pain program I think.  I feel like I have the flu all the time and it is more a physical feeling than a mental thing."); Tr. 7879 (treatment note from Dr. Philpot dated February 28, 2019, indicating that Plaintiff's MSE revealed sad and anxious mood, restricted affect, and that Plaintiff's response to treatment had been fair/poor).)

Moreover, while the ALJ stated that "the treatment notes throughout the period at issue show" that Plaintiff had been prescribed various medications "including Zoloft, Lyrica, and Bupropion for his depression with good results," and that his depression had been noted as stable, the record overall tends to indicate otherwise, as Plaintiff's medications had to be continuously monitored, adjusted, changed, or discontinued due to adverse effects.  (*See, e.g.*, Tr. 6968 ("Patient reports that he feels quetiapine helps

with anger, but also contributes to his worsening [] isolation and [low] energy.") Tr. 6929-30 (treatment note from Dr. Vuyyuru dated June 19, 2017, indicating that Plaintiff was advised to taper off Lyrica after it caused him to gain 40 pounds and that she would also "discontinue MTX [methotrexate] if liver enzymes continue to rise further"); Tr. 7591-93 (treatment notes from Dr. Philpot dated May 9, 2018, indicating that Plaintiff had to stop taking psychotropics because of liver and kidney problems and, as a result, he was much more irritable and noting that while Plaintiff had shown positive response to treatment, his progress was limited and had "even shown regression recently (7% increase in PCL-5 scores) in the absence of psychotropic therapy"); Tr. 7860-61 (treatment note from Dr. Philpot, dated April 26, 2019, indicating that Plaintiff's response to treatment was fair, progress was poor); Tr. 7842 (abdominal ultrasound results dated April 2, 2019, revealing an enlarged liver and a hepatic lesion).)

Although Defendant maintains that the ALJ properly discounted Dr. Luis-Roig's opinion that Plaintiff could not sustain an eight-hour workday, five days a week because Dr. Luis-Roig failed to provide an explanation for her opinion, these arguments are unavailing in light of the evidence as a whole, including Dr. Luis-Roigs' treatment records. Additionally, while the ALJ appears to reject the State agency medical consultant's opinion in part because he did not have an opportunity to review the entire record, that

opinion was, incidentally, rendered contemporaneously with the State psychological consultant's opinion in July of 2017, to which the ALJ gave partial weight, even though that consultant also did not review the record evidence dated after July of 2017 (particularly the record evidence tending to show that Plaintiff's mental health symptoms were often severe, and while they waxed and waned at times, his condition appears to have plateaued and was exacerbated by his adverse reaction to medications, including elevated liver enzyme levels which required periodic discontinuation of medications).

## B. Plaintiff's Use of a Cane

Next, Plaintiff argues that the ALJ failed to properly consider the opinions of Ms. Devine, a licensed practical nurse, regarding Plaintiff's "prescribed" use of a cane.  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 416.927(a)(1).  "While the opinions of 'other sources,' such as nurse practitioners and mental health counselors, are not entitled to deference, generally the ALJ 'should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning,

when such opinions may have an effect on the outcome of the case.'"

*Hollinger v. Colvin*, No. CA 13-00565-C, 2015 WL 1470697, at *6 (S.D. Ala. Mar. 31, 2015) (citing *Butler v. Astrue*, No. CA 11-00295-C, 2012 WL 1094448, at *3 (S.D. Ala. Mar. 30, 2012)) (internal citations omitted).

To the extent Plaintiff argues that the ALJ failed to weigh the medical records from Ms. Devine, a non-acceptable medical source, the ALJ was not required to give these opinions any special deference.  Nevertheless, the ALJ should have explained the weight given to Ms. Devine to the extent she provided an opinion regarding the severity of Plaintiff's impairment(s) and how his limitation(s) affect his ability to function, SSR 06-3p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), "or otherwise ensure[d] that the discussion of the evidence in the determination or decision allow[ed] [Plaintiff] or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case."  20 C.F.R. § 404.1527(f) ("Evaluating opinion evidence for claims filed before March 27, 2017.").  Here, the ALJ failed to discuss Plaintiff's use or purported need for a cane, but noted that Plaintiff's gait was noted to be normal, particularly in more recent treatment notes.   However, this is insufficient for the Court to determine whether the ALJ properly considered the evidence that Plaintiff required the use of a cane. *See Curry v. Comm'r of Soc. Sec.*, No. 6:13-cv-1682-Orl-41TBS, 2015 WL 269039, at *4 (M.D. Fla. Jan. 21, 2015) ("Because the ALJ failed to

consider 'other source' evidence from the VA and Mr. Sayger, (and affirmatively declared that it did not exist), the ALJ did not provide any analysis of the medical necessity of Plaintiff's cane.  Nor did the ALJ provide any discussion and analysis of whether Plaintiff's use of a cane should have been included in the RFC and the hypothetical question posed to the VE.").

While Defendant argues that the May 5, 2017 treatment record from Ms. Devine that Plaintiff cited to does not state that he was prescribed a cane, the record indicates otherwise.  The nursing note authored by Ms. Devine states that Plaintiff had been "evaluated and identified as [h]igh [r]isk for [f]alls by his[] primary care team" and that he used a cane sometimes.  (Tr. 6830.)  Even if the note from Ms. Devine is ambiguous as to whether a cane was prescribed at that time, other treatment notes from Plaintiff's physical therapists also indicate that Plaintiff was "issued a standard cane" and received gait "training on level and uneven surfaces." (See Tr. 7352-53 (physical therapy note dated July 21, 2017 and signed by Molly Kirk, PTA, CL (assistant physical therapist) and co-signed by Doris Gonzalez, PT (physical therapist), noting: "Patient was issued a standard cane.  Gait training on level and uneven surfaces was provided for patient. . . . Assessment: Supine exercises not tolerated due to increased pain.  Bilateral knee pain reported during exercises requiring knee extension.  Lying prone and prone press-ups tolerated well.  Patient issued a standard cane and is

modified independent with use of cane on level and uneven surfaces. Continued focus on back pain.").)  Therefore, the ALJ's failure to discuss Plaintiff's use of a cane also supports a remand.

## IV.   Conclusion

Based on the foregoing, the Court finds that the ALJ failed to properly assess the treatment records and opinion of Dr. Luis-Roig, and it is unclear what impact this evidence would have on the ALJ's formulation of Plaintiff's RFC, or the other steps, including step three, in evaluating Plaintiff's fibromyalgia.  Similarly, the ALJ's failure to discuss Plaintiff's use of a cane also constitutes a reversible error.  As such, the ALJ's decision is not supported by substantial evidence and the case will be reversed and remanded with instructions to the ALJ to reconsider the medical evidence and opinions of record and to explain what weight they are being accorded, and the reasons therefor.

Because these issues are dispositive, there is no need to address Plaintiff's remaining arguments.  *See Knoblock*, 2015 WL 4751386, at *3 (citing, *inter alia*, *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983)).

Accordingly, it is **ORDERED**:

1.    The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the ALJ to conduct the five-step

sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, conduct any further proceedings deemed appropriate, and to develop a complete record.

2.     The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.     In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on September 23, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record